**MOGINLAW LLP**
Daniel J. Mogin (SBN 95624)
Timothy Z. LaComb (SBN 314244)
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:  (619) 687-6611
dmogin@moginlawllp.com
tlacomb@moginlawllp.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL RASMUSSEN<br><br>Plaintiff,<br><br>vs.<br><br>COLLECTORS HOLDINGS, INC., PROFESSIONAL SPORTS AUTHENTICATOR, SPORTSCARD GUARANTY CORPORATION, BECKETT GRADING SERVICES<br><br>Defendants. | Case No:<br><br>**COMPLAINT FOR:**<br><br>(1) Violation of Sherman Act, § 2<br>(2) Violation of Clayton Act, § 18<br><br><br>**<u>CLASS ACTION</u>**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff Michael Rasmussen ("Plaintiff") brings this action against Defendants Collectors Holdings, Inc. ("Collectors"), Professional Sports Authenticator ("PSA"), Sportscard Guaranty Corporation ("SGC"), and Beckett Grading Services ("BGS") (collectively, "Defendants") for violations of federal antitrust laws based on Defendants' anticompetitive business practices that have harmed Plaintiff and a class of similarly situated consumers. Specifically, Plaintiff alleges as follows:

## I.   NATURE OF THE ACTION

1.   This case arises from Defendant Collectors' unlawful and anticompetitive acquisitions of Defendants SGC and BGS (the "Acquisitions"). The Acquisitions not only substantially lessened competition in the market for grading services for individual trading cards in the U.S. (the "Relevant Market") in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, but also enabled Defendant Collectors to unlawfully maintain its monopoly in the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

2.   Millions of people in the U.S. collect sports and/or character trading cards. The primary market for trading cards consists of the sale of sealed packs of multiple unknown trading cards. Once pulled from packs, trading cards are sold individually on the secondary market through online platforms like eBay or in-person at card shops or card shows.

3.   The value of the individual cards on the secondary market is largely based on their condition. However, the condition of cards is difficult to assess and compare because minor imperfections can significantly alter the value of a card. Given this, a service industry emerged in which consumers pay to have their cards "graded," which entails sending their trading cards to a third-party company that evaluates condition and authenticity and assigns the cards on a scale from 1 (lowest) to 10 (highest).

COMPLAINT

4.      This card grading service industry provides standardization and certainty regarding a card's condition and can significantly increase the value of the card. In that sense, the card grading industry is analogous to expert art appraisers that verify the authenticity and condition of art or diamond certification companies that grade and verify the authenticity of diamonds.

5.      Prior to the Acquisitions, there were four major independent card grading companies: (i) Defendant PSA, which has been owned and operated by Defendant Collectors since 2021 and controlled roughly 72% of the Relevant Market; (ii) Defendant SGC, which controlled roughly 5% of the Relevant Market; (iii) Defendant BGS, which controlled roughly 3% of the Relevant Market; and (iv) non-party Certified Guaranty Company ("CGC"), which controlled roughly 18% of the Relevant Market.

6.      Although PSA was the dominant player in the market, Defendants SGC and BGS served important roles as growing competitors that offered lower prices and higher quality services (usually through faster turnaround times for card grading) than PSA. As a result, they provided significant downward competitive pressure on prices and upward competitive pressure on service quality for consumers.

7.      Rather than compete with SGC and BGS on the merits by decreasing prices and/or increasing service quality, Defendant Collectors acquired both companies to cement its monopoly power in the Relevant Market. Collectors acquired SGC in February 2024 and BGS in December 2025. As a result of the Acquisitions, Defendant Collectors controls roughly 80% of the Relevant Market.

8.      Following each acquisition, Defendant Collectors increased prices and decreased the quality of services for both PSA and the acquired company. For example, following its acquisition of SGC, Collectors increased prices for SGC services by 20%, increased turnaround times for graded cards by as much as 400%,

and reallocated significant assets from SGC to PSA to shrink SGC and turn it into a specialized boutique grading company, i.e., not a competitor to PSA.

9.     Through these actions, Defendants harmed competition and consumers. Not only did Defendants reduce the number of major independent competitors in the Relevant Market from four to two, but they also eliminated competitors that were putting downward pressure on prices and upward pressure on service quality. As detailed above and below, this allowed Defendants to profitably increase prices to supra-competitive levels and decrease service quality for consumers.

10.     There have been no governmental agency reviews of the mergers challenged in this Complaint, including no filing pursuant to the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act").

## II.   PARTIES

11.     Plaintiff Michael Rasmussen is a resident of Phoenix, Arizona. He submitted cards for grading to PSA during the Class Period. Plaintiff paid higher prices and received worse services than he would have paid and received but-for the Acquisitions.

12.     Defendant Collectors is the parent company of Defendants PSA, SGC, and BGS. It controls roughly 80% of the Relevant Market. It is headquartered in Santa Ana, California. As of 2025, Collectors was valued at $4.3 billion and generates between $400-$700 million in annual revenue from its card grading services.

13.     Defendant PSA is the leading trading card grading service provider and controls roughly 72% of the Relevant Market. PSA was acquired by Collectors in 2021. PSA was founded in July 1991 and is headquartered in Santa Ana, California.

14.     Defendant SGC is a card grading service provider that controlled roughly 5% of the Relevant Market when acquired by Defendant Collectors. SGC

3
COMPLAINT

is headquartered in Boca Raton, Florida, and was acquired by Defendant Collectors in February 2024.

15. Defendant BGS is a card grading service provider that controlled roughly 3% of the Relevant Market when acquired. BGS was acquired by Defendant Collectors in December 2025 and is headquartered in Plano, Texas.

16. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their respective directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Defendants' affairs.

17. Each Defendant, through its subsidiaries, divisions, affiliates and agents, operated as a single unified entity with each acting as the agent or joint-venturer of or for the others with respect to the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals, and controlling parties.

18. Various other persons not named as Defendants have participated as co-conspirators or joint venturers with Defendants and have made contracts, performed acts, and made statements in furtherance of Defendants' unlawful acts and conspiracy. The Defendants are jointly and severally liable for the acts of such persons or entities and Plaintiff is informed and believes, and on that basis alleges, that each such entity is responsible in some manner for the occurrences herein alleged, or was acting in concert with, and with the permission, approval, and authorization of, the specifically named Defendants. Plaintiff will seek leave of the Court to amend this pleading to set forth the true names and capacities of such parties when the same are ascertained.

## III. JURISDICTION AND VENUE

19. The claims in this action arise under the federal antitrust laws, 15 U.S.C. §§ 2, 15 and 18.

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 15.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 15 because Defendants Collectors and PSA are headquartered in Santa Ana, California, and all Defendants do substantial business in this District.

## IV. FACTUAL ALLEGATIONS

### A. Background of the Card Grading Industry

22. The trading card market in the U.S. is a multi-billion-dollar industry that is expected to more than double in size by 2031. The trading card market consists of two main segments: sports trading cards (e.g., baseball cards) and character trading cards (e.g., Pokémon cards).

23. The primary market for trading cards concerns the sale of several unknown cards in sealed packs. Once a pack is opened, the cards are considered "raw." If any of the raw cards are valuable, then they can be sold individually on the secondary market for trading cards. Consumers sell individual cards on the secondary market on digital platforms like eBay or Whatnot and in-person at brick-and-mortar card shops or card shows.

24. The value of raw cards is primarily based on (i) demand for the player or character depicted on the card, (ii) the rarity of the card, (iii) unique features associated with the card (e.g., rookie card, autograph, jersey patch), and (iv) the condition of the card. For example, in general, Michael Jordan cards are more valuable than Dennis Rodman cards because there is greater demand for Michael Jordan cards; rare Michael Jordan cards are more valuable than common Michael Jordan cards; autographed Michael Jordan cards are more valuable than non-autographed Michael Jordan cards; and a Michael Jordan card in mint condition is more valuable than the same card with noticeable condition defects.

5

COMPLAINT

25.     While card condition is a significant factor in determining the value of trading cards, it is very difficult to assess and compare between cards, particularly when cards are sold online.

26.     Given the importance of condition for trading cards, a service industry developed in which consumers pay third-party companies to assess the condition and authenticity of a card and assign it a condition grade from 1 to 10. The grading company also places the card in a protective case that displays a description of the card and its assigned grade.

27.     When assigning a grade to a trading card, third-party grading companies assess various aspects of trading cards, which include: (i) surface quality, (ii) corner quality, (iii) edge quality, and (iv) centering of the image on the card. Once these aspects are assessed, the grading company assigns its grade.

28.     The following images show a raw (top) and a graded (bottom) 1986 Michael Jordan Fleer rookie card. The graded card received a grade from PSA of 5:





29.   The card grading market (i.e., the Relevant Market) is significant and rapidly growing. This industry generates several hundreds of millions of dollars in revenue per year and is expected to more than double its annual revenue by 2031. In 2025, consumers graded 26.6 million cards with the four major card grading companies. PSA graded 19.2 million cards (72%); CGC graded 4.92 million cards (18%); SGC graded 1.42 million cards (5%); and BGS graded 824 thousand cards (3%).

30.   In general, consumers grade cards to increase the value of the card. A card that receives a high grade carries significantly more value than the same card in raw form. For example, a 1987 Barry Bonds rookie card from Topps in "raw" form recently sold for $1; for $39.95 as a PSA 9; and for $655 as a PSA 10.[1]

31.   The speed at which cards are graded and returned to the consumer (i.e., turnaround time) is very important because the secondary trading card market is volatile and dynamic, particularly during the respective season for current players. For example, the following chart shows the value of a PSA 10 2024 Silver Prizm rookie card for Drake Maye (quarterback of the New England Patriots) from

---

[1]   https://www.sportscardspro.com/game/baseball-cards-1987-topps/barry-bonds-320.

7

COMPLAINT

roughly the beginning of October 2025 through early March 2026. Between October 2025 and January 2026, the value of the card nearly doubled, which corresponded with good performances by Maye. Then, from January 2026 to March 2026, the value of the card dropped nearly 40%, which corresponds with poor performances by Maye and a loss by his team in the Super Bowl.



32.     As the above chart demonstrates, a collector who sent a Maye rookie card to a grading service provider in October and received it back by early January 2026 would have been able to sell the card for significantly more than a collector who also sent the card to a grading company in October but did not receive the card back until early February.

**B. SGC Increases Market Share by Offering Lower-Cost, Faster Alternative to PSA**

33.     Beginning in 2023, SGC made a concerted effort to increase market share by offering collectors lower prices and better service through faster turnaround times. According to SGC's then-President Peter Steinberg, this represented "a very aggressive push to expand the SGC footprint and offer collectors the best grading experience possible."[2]

34.     Specifically, in 2023, SGC began offering grading services for as low as $15 per card with turnaround times of 5-10 business days. It also began offering an "immediate" service that cost $40 per card and had a turnaround time of 1-2

---

[2] https://sportscollectorsdigest.com/news/collectors-psa-acquire-card-grading-rival-sgc-.

8

COMPLAINT

business days. During this same time, SGC began partnering with businesses (e.g., brick-and-mortar card shops) to offer bulk grading services at even lower rates that were typically around $12 per card. Consumers could take advantage of these bulk rates by submitting cards for grading through the partner-businesses.

35.     SGC's prices and services were significantly better than those offered by PSA, which dominated the Relevant Market. At this time, PSA charged an upfront membership fee of $150 and $19 per card for its least expensive grading service. PSA also had turnaround times of 20-30 business days. Therefore, a person who purchased the least expensive grading services for 20 cards from SGC in 2023 would save $230 and receive the cards 10-25 days faster than if purchasing the same level of grading services from PSA.

36.     By offering lower prices and faster turnaround times, SGC substantially increased the volume of trading cards it graded and, therefore, its share of the Relevant Market. In 2022, before the changes were implemented, SGC graded roughly 930,000 trading cards. In 2023, SGC graded roughly 1.2 million trading cards, which represented a nearly 30% increase from 2022. In 2024, its first full year with the lower prices and higher service quality, SGC graded 1.8 million trading cards, representing a 50% increase from 2023 and a nearly 100% increase from 2022.

### C. Collectors Acquires SGC and Increases Prices and Turnaround Times

37.     Rather than compete on the merits, Collectors responded to the increased competition from SGC by acquiring it. Collectors announced it would acquire SGC on February 29, 2024. Immediately before the acquisition, Collectors controlled roughly 72% of the Relevant Market and SGC controlled roughly 5% of the Relevant Market. Following the transaction, Collectors controlled roughly 77% of the Relevant Market.

38.     When announcing the acquisition, the companies claimed SGC would

continue to operate independently within the Collectors portfolio; that SGC would continue to be led by its then-current management team; and that SGC would not implement any changes to its services except to use Collectors' assets to "double down on [its] strengths while greatly enhancing [its] capabilities to innovate and modernize [] offerings moving forward."[3] None of these statements were true.

39.     Instead, Collectors systematically depleted SGC's assets, increased its prices, and reduced the quality of its services to eliminate SGC as a viable competitor and enable PSA to maintain its monopoly. In March 2024, less than a month after the acquisition, Collectors increased prices for SGC's least expensive and most popular grading services from $15 to $18 per card – a 20% increase. Collectors also increased prices for expedited grading services from $40 to $150 – a 275% increase, and has completely eliminated such services for trading cards valued at less than $1,500.

40.     In mid-2024, Collectors increased estimated turnaround times for its least expensive grading services from 10-15 days to 15-30 days – a 33-150% increase. SGC has continued to increase turnaround time estimates since then, as turnaround time estimates are now 40-50 business days - a 166% to 400% increase from its pre-acquisition estimates.

41.     Collectors also reallocated SGC assets to PSA, further eroding SGC's ability to compete. For example, in July 2025, Collectors announced it was reallocating staff and office space from SGC to PSA to "scale down" SGC and increase capacity at PSA. Collectors admitted that it engaged in these actions to "shrink" SGC and turn SGC into a boutique grading service provider focused on the niche vintage sports card market.[4]

---

[3] https://www.sportscollectorsdaily.com/report-psa-parent-company-set-to-acquire-sgc/.

[4] *Id.*

10

COMPLAINT

42.    Also in 2025, Collectors took over day-to-day management of SGC. Amid the plans to turn SGC into a boutique grading company, Peter Steinberg, then-President of SGC, announced he would resign. Rather than appoint a new head of SGC, Collectors appointed its own CEO, Nat Turner, to take over operations of SGC.

43.    SGC began to bleed market share precipitously due to its higher prices, slower turnaround times, and reallocation of assets to PSA. In July 2025 (when Collectors announced it was scaling down operations at SGC), SGC was grading roughly 150k cards per month.  By September 2025, SGC was grading only 63k cards per month (more than 58.5% decrease from July). By October 2025, SGC was grading only 50k cards per month (a 66% decrease from July). SGC experienced these losses in grading volume while every other major card grading company was experiencing significant increases in grading volume, meaning the loss in grading volume by SGC was not due to general market trends.

### D. Collectors Acquires BGS and Immediately Increases Prices for BGS Services

44.    On December 15, 2025, Collectors announced it would acquire BGS. Immediately prior to this acquisition, Collectors controlled roughly 77% of the Relevant Market and BGS controlled roughly 3%. Therefore, following the acquisition, Collectors controlled roughly 80% of the Relevant Market.

45.    Immediately following the acquisition, Collectors increased prices for certain BGS services. According to reports, in January 2026, BGS more than doubled its per card price for in-person grading services at certain large trading card shows from roughly $25 to $60. This brought BGS much more in line with PSA pricing for in-person grading at large card shows.

///

///

///

11

COMPLAINT

**E. Collectors Increases Prices and Turnaround Times at PSA Following Each Acquisition**

46.     In September 2025 (after its acquisition of SGC and reallocation of its assets but before its acquisition of BGS), Collectors increased prices and turnaround times for PSA's most popular grading service levels. Specifically, PSA increased prices as follows:

- Value Bulk: $19.99 per item to $21.99 (a roughly 10% increase);
- Value: $24.99 to $27.99 (a roughly 12% increase); and
- Value Plus: $39.99 to $44.99 (a roughly 12.5% increase).

47.     Also in September 2025, PSA increased turnaround times for popular service levels as follows:

- Value Plus: increased from 20 to 25 days;
- Value Max: increased from 15 to 20 days; and
- Regular increased from 10 to 15 days.

48.     PSA has continued to increase turnaround times for its service levels since the SGC acquisition.

49.     Shortly after its acquisition of BGS, Collectors again increased prices and estimated turnaround times for several PSA services. Specifically, in February 2026, Collectors announced the following price increases for PSA:

- Value Bulk: $21.99 to 24.99 (a roughly 14% increase), including a 20-card minimum submission;
- Value: $27.99 to $32.99 (a roughly 15% increase); and
- Value Plus: $44.99 to $49.99 (a roughly 11% increase).

50.     At this same time, PSA eliminated its bulk rate for character/TCG cards and combined it with its Value Bulk rate, which amounted to a significant increase in price.

51.     Also in February 2025, Collectors announced the following increases to estimated turnaround times:

12

COMPLAINT

- Value Bulk: increased to 95 days;

- Value: increased from 40 days to 45 days; and

- Value Plus: increased from 30 days to 35 days.

**F. The Relevant Market**

52.    The relevant product market in this action is the market for grading services for individual trading cards, including both sports and character cards. This market constitutes a line of commerce and includes all reasonable substitutes.

53.    Card grading services for trading cards is a unique service that provides commoditization and value for trading cards that no other service provides. Card graders undergo significant training and grade thousands of cards per day, meaning there is no substitutable service for their expertise and ability to evaluate the condition and authenticity of cards. The service they provide is akin to services provided by expert art appraisers or expert diamond certifiers and graders. Therefore, consumers would not (because they could not) turn to an alternative service if faced with a small but significant non-transitory increase in price in card grading services.

54.    The relevant geographic market is the United States. Consumers can submit individual cards to all grading service providers from anywhere in the United States. Therefore, the area in which card grading service providers compete is the entirety of the United States. While local collectors or card shop owners can give their opinion on condition and authenticity of an individual card, their opinion is not a substitute for those of the major grading services. Not only do these individuals lack the expertise of the major grading service providers, but they also lack recognition and trust by buyers, meaning any services they provide would not add value to the trading card.

**G. Collectors Possesses Market Power in the Relevant Market**

55.    Due to the Acquisitions, Collectors has been able to profitably increase prices in the Relevant Market above competitive levels. As shown above, following

13

COMPLAINT

its acquisition of lower-priced competitors, Collectors has increased prices for all grading companies under its control to supra-competitive levels. It has also repeatedly eroded the quality of grading services for these companies. Despite charging supra-competitive prices for worse services, Collectors has not lost overall market share.

56.    During all relevant times, Collectors had a high share of the Relevant Market, ranging between 72% and 80%. Collectors controlled 72% of the Relevant Market through its ownership of PSA before the Acquisitions; it controlled 77% of the Relevant Market following its acquisition of SGC; and it controlled 80% of the Relevant Market following its acquisition of BGS.

57.    Collectors can maintain its market power in the Relevant Market due to the market's significant barriers to entry and expansion. For card grades to add value to a trading card, they must come from a company that consumers know and trust. It takes significant time, money, and other resources for companies to develop this consumer trust. Moreover, card grading services must be performed by trained and experienced professionals. Therefore, it takes significant time and resources for grading companies to expand operations and increase the volume of trading cards it grades.

### H. Antitrust Injury

58.    Through the Acquisitions and related actions, Defendants have directly and substantially injured competition and consumers in the Relevant Market.

59.    By acquiring SGC and BGS, Collectors has cut the number of major independent competitors in the Relevant Market in half, reducing the number from four to two. It has also eliminated two independent competitors that were offering lower prices and better services than PSA, meaning the Acquisitions eliminated downward pressure on prices and upward pressure on quality of services.

60.    Due to the Acquisitions, Collectors has been able to profitably and repeatedly increase prices and degrade service quality for PSA, SGC, and/or BGS.

As demonstrated above, Collectors increased prices and decreased quality of services for PSA and SGC following its acquisition of SGC, and increased prices and/or decreased quality of service for PSA and BGS following its acquisition of BGS. As a result, consumers are forced to pay higher prices for lower quality services.

61. According to the Herfindahl-Hirschman Index ("HHI"), each of the Acquisitions is presumed to substantially lessen competition or tend to create a monopoly for Collectors. To calculate the HHI for an industry, one sums the squares of the market shares. According to the 2023 Merger Guidelines issued by the U.S. Department of Justice and the Federal Trade Commission, an industry with an HHI greater than 1,800 is highly concentrated. In such markets, a merger that generates an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly.

62. Prior to the Acquisitions, the HHI of the market for card grading services was 5,542. The Relevant Market was, therefore, highly concentrated prior to the Acquisitions. Collectors' acquisition of SGC increased the HHI to 6,287 – an increase of 745. Collectors' acquisition of SGC was, therefore, presumed to substantially lessen competition and/or tend to create a monopoly for Collectors.

63. Collectors' acquisition of BGS increased the HHI from 6,287 to 6,724 – an increase of 437. Therefore, Collectors' acquisition of BGS also was presumed to substantially lessen competition and/or tend to create a monopoly for Collectors.

## V.   CLASS ACTION ALLEGATIONS

64. Plaintiff brings this action on behalf of himself, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), seeking damages as well as equitable and injunctive relief for the following class:

> All persons and entities in the United States and its territories who purchased PSA trading card grading services to grade trading card(s) during the period of February 29, 2024, until the Defendants' unlawful conduct and anticompetitive effects cease to persist (the "Class")

65.     Exclusions: Specifically excluded from the Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Further excluded from the Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

66.     Class Identity: The Class is readily identifiable and for which records exist.

67.     Numerosity: Class Members are so numerous and geographically dispersed that joinder is impracticable. There are at least tens of thousands of members spread across the U.S. in the proposed Class.

68.     Typicality: Plaintiff's claims are typical of the claims of Class Members because Plaintiff overpaid for trading card grading services from PSA due to the anticompetitive conduct alleged herein.

69.     Defendants have acted in a manner that applies generally to Plaintiff and all Class Members. Each Class Member has been similarly impacted by Defendants' unlawful conduct and concerted action alleged herein.

70.     Commonality: There are questions of law and fact common to the Class, including, but not limited to:

    a.     Whether Collectors has monopoly power in the Relevant Market;

    b.     Whether Collectors' acquisition of SGC may substantially lessen competition in the Relevant Market;

    c.     Whether Collectors' acquisition of BGS may substantially lessen competition in the Relevant Market;

    d.     Whether Collectors' acquisitions of SGC and/or BGS artificially increased prices for grading service in the Relevant Market;

    e.     Whether Defendants' conduct violates Section 2 of the Sherman Act;

16

COMPLAINT

f.    Whether Defendants' conduct violates Section 7 of the Clayton Act; and

g.    Whether Plaintiff and Class Members were injured by Defendants' conduct.

71.    Predominance: The above-listed questions of law and fact are common to all Class Members and predominate over any questions that may affect Class Members individually.

72.    Adequacy: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of complex antitrust class actions to represent himself and the Class.

73.    Superiority and Manageability: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. The individual prosecution of separate actions by individuals would lead to repetitive adjudication of common questions of fact and law and create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants. There will be no difficulty in the management of this action as a class action.

## VI.   CLAIMS

**COUNT I**
**Violation of Section 7 of the Clayton Act**
**15 U.S.C. § 18**
**(Against All Defendants)**

74.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

75.    The Acquisitions are likely to substantially lessen competition in the Relevant Market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

17
COMPLAINT

76. For the reasons described above, the relevant product market is the market for trading card grading services. The relevant geographic market is the United States.

77. Unless undone, the Acquisitions will continue to have the following detrimental effects:

a) Elimination of competition between PSA, SGC, and/or BGS in the Relevant Market;

b) Elimination of SGC as a viable competitor in the Relevant Market;

c) Eventual elimination of BGS as a viable competitor in the Relevant Market;

d) Elimination of downward pressure on prices from SGC and/or BGS, causing higher prices than would exist but-for the Acquisitions;

e) Elimination of upward pressure on quality of services, causing a degradation in services that would exist but-for the Acquisitions; and

f) Intentional reduction in capacity to grade trading card sin the Relevant Market.

78. Barriers to entry are high in the Relevant Market, and new entry will not be timely, likely, or sufficient to replace the competition lost due to the Acquisitions.

79. As described above, the Acquisitions are likely to harm competition and consumers. Due to the Acquisitions, Class Members have and will continue to face higher prices, lower quality services, and reduced output. These effects flow directly from the Acquisitions.

**COUNT II**
**Monopolization or Attempted Monopolization in Violation of Section 2 of the Sherman Act**
**15 U.S.C. § 2**
**(Against Defendant Collectors)**

80. Plaintiff incorporates and realleges every allegation set forth in the

18
COMPLAINT

preceding paragraphs of this Complaint as though fully set forth herein. Plaintiff seeks equitable and injunctive relief on behalf of himself and a class of persons, as described herein.

81. The Relevant Market is the market for card grading services for trading cards in the United States. The Relevant Market constitutes a relevant antitrust market because it includes all reasonable substitutes and is confined to the geographic area that corresponds to market realities, mainly that consumers can submit their cards to grading service providers from anywhere in the U.S.

82. Defendant Collectors has monopoly power in the Relevant Market. It controlled roughly 72% of the Relevant Market before the Acquisitions. It now controls more than 80% of the Relevant Market following the Acquisitions. It has also proved to be able to control prices and output in the Relevant Market and has been able to profitably and sustainably increase prices to supra-competitive levels and restrict output.

83. Defendant Collectors unlawfully maintained monopoly power in the Relevant Market through the anticompetitive Acquisitions and related misconduct. As described above, SGC and BGS were viable competitors to PSA (subsidiary of Collectors) that offered lower prices and better services than PSA. Rather than compete on the merits, Collectors acquired SGC in 2024 and BGS in 2025. Collectors eliminated SGC as a viable competitor by gutting its assets and turning the company into a boutique grading service provider that specialized in vintage cards. Collectors also forced SGC to increase prices and turnaround times for consumers. Collectors has increased prices for certain BGS grading services in just the few months since BGS was purchased.

84. In addition, both Acquisitions are presumed to substantially lessen competition and/or tend to create a monopoly for Collectors based the HHI index. The Relevant Market was highly concentrated before the Acquisitions. Each of the Acquisitions increased the HHI for the Relevant Market by more than 400 points,

COMPLAINT

making both presumptively anticompetitive.

85.     There is no legitimate procompetitive justification for Defendants' anticompetitive conduct. Even if there were, there are much less restrictive alternatives that can be used to achieve them.

86.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been injured and will continue to be injured. Specifically, Plaintiff and Class Members have been forced to pay higher prices and receive worse services when grading cards with PSA, SGC, and/or BGS. Such economic harm suffered by Plaintiff and Class Members constitutes antitrust injury.

87.     Plaintiff and the Class Members are entitled to treble damages for their overpayments caused by Defendant's misconduct. They are also entitled to attorneys' fees and costs, and injunctive relief, including enjoining and undoing the Acquisitions.

**PRAYER FOR RELIEF**

88.     WHEREFORE, Plaintiff, for himself and on behalf of the Class of all others similarly situated, respectfully requests judgment against Defendants and the following relief:

A.     An Order determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative, and appoint counsel of record as Class Counsel;

B.     A finding that Defendants violated Section 7 of the Clayton Act by engaging in the Acquisitions and related anticompetitive conduct;

C.     A finding that Defendants violated Section 2 of the Sherman Act by engaging in the anticompetitive conduct alleged herein;

COMPLAINT

D.    An award of damages to Plaintiff and Class Members, including statutory treble damages, compensatory damages, punitive damages, and pre- and post-judgment interest to the extent permitted by law;

E.    An order enjoining Defendants from continuing to implement either of the Acquisitions;

F.    An order undoing the Acquisitions and requiring Collectors to divest the assets of SGC and BGS, enabling each to function as independent companies;

G.    An Order awarding Plaintiff attorney's fees, expenses, and taxable costs to the extent permitted by law; and

H.    Such other further relief as the Court deems just and proper to protect and compensate Plaintiff and the Class Members.

## JURY DEMAND

Plaintiff demands trial by jury of all issues so triable as of right.

DATED:

**MOGINLAW LLP**

Daniel J. Mogin (SBN 95624)
Timothy Z. LaComb (SBN 314244)
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone:  (619) 687-6611
Facsimile:   (619) 687-6610
dmogin@moginlawllp.com
tzlacomb@moginlawllp.com

21
COMPLAINT